**The Honorable Benjamin H. Settle**

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

MICKEY FOWLER, LEISA MAURER, and a class of similarly situated individuals,

Plaintiffs,

v.

TRACY GUERIN, Director of the Washington State Department of Retirement Systems,

Defendant.

Case No. 3:15-cv-05367-BHS

**MOTION TO DETERMINE FORMULA FOR INJUNCTIVE RELIEF**

NOTE ON MOTION CALENDAR:
March 21, 2025

---

## MOTION TO DETERMINE FORMULA FOR INJUNCTIVE RELIEF

---

David F. Stobaugh, WSBA #6376
Stephen K. Strong, WSBA #6299
Alexander F. Strong, WSBA #49839
STOBAUGH & STRONG, P.C.
126 NW Canal Street, Suite 100
Seattle, Washington 98107
(206) 622-3536
*Attorneys for Plaintiffs*

**MOTION TO DETERMINE FORMULA**
3:15-cv-05367-BHS

## <u>Table of Contents</u>

Matter Before the Court ........................................................................................................1

Issue Presented and the Parties' Positions ..........................................................................1

Matters Already Established .................................................................................................3

Summary of Formula ............................................................................................................6

Proposed Formula

    I.     Problems the Formula Addresses ...........................................................................7

    II.    Components of the Formula ...................................................................................

         A.   First Component – Calculating Daily Interest .........................................8

         B.   Second Component – Accounting for the Daily Interest Missing from the Transfer Payment ..........................................................................9

         C.   Third Component – Investment Returns in the Commingled Trust Fund ..........10

    III.   Application of the Formula ...................................................................................16

    IV.   The Director's Quibbles Do Not Provide a Basis for Denying the Teachers' Motion to Approve the Formula .........................................................18

Conclusion ..........................................................................................................................21

**STOBAUGH & STRONG, P.C.**
126 NW CANAL STREET, SUITE 100
SEATTLE, WASHINGTON  98107
(206) 622-3536

1

## Table of Authorities

2

**Washington Cases**

3

*Bowles v. DRS,*
121 Wn.2d 52 (1993) ................................................................................... 4

4

*In re Wash. Builders Benefit Trust,*
5      173 Wn.App. 34 (2013) ............................................................................. 12

6

*Moore v. HCA,*
181 Wn.2d 299 (2014) ........................................................................ 14, 21

7

*Nelson v. Appleway Chev.,*
160 Wn.2d 173 (2007) ............................................................................. 14

8

*O'Brien v. Shearon Hayden Stone,*
9      90 Wn.2d 680 (1978) .................................................................................. 5

10

*Probst v. DRS,*
167 Wn.App. 180 (2012) ........................................................................ 3, 4

11

*State Ret. Board v. Yelle,*
31 Wn.2d 87 (1948) ................................................................................... 4

12

13

*Wenzler & Ward Plumbing v. Sellen,*
53 Wn.2d 96 (1958) ................................................................................. 21

14

**Federal Cases**

15

*Adray v. Adray-Mart, Inc.,*
16      76 F.3d 984 (9th Cir. 1995) ..................................................................... 21

17

*American Timber & Trading Co. v. First Nat. Bank of Oregon,*
511 F.2d 980 (9th Cir. 1973) ..................................................................... 5

18

*Bigelow v. RKO Pictures, Inc.,*
19      327 U.S. 251 (1946) ................................................................................. 21

20

*BKB v. Maui Police Dept.,*
276 F.3d 1091 (9th Cir. 2002) ................................................................... 3

21

*Chavez v. IBP, Inc.,*
2005 WL 8158586 (E.D. Wash. May 18, 2005) ..................................... 17

22

*Fowler v. Frost,*
23      2015 WL 930486 (W.D. Wash. Dec. 22, 2015) ......................................... 4

24

*Fowler v. Guerin,*
2019 WL 3337964 (W.D. Wash. July 25, 2019) ..................................... 4, 6

25

*Fowler v. Guerin,*
2021 WL 228900 (W.D. Wash. Jan. 22, 2021) ................................. 4, 5, 19

26

*Fowler v. Guerin,*
27      2021 WL 3129626 (W.D. Wash. July 23, 2021) ............................ 5, 7, 8, 9

**MOTION TO DETERMINE FORMULA** - ii
3:15-cv-05367-BHS

**STOBAUGH & STRONG, P.C.**
126 NW CANAL STREET, SUITE 100
SEATTLE, WASHINGTON  98107
(206) 622-3536

*Fowler v. Guerin*,
  2024 WL 4891016 (9th Cir. Nov. 26, 2024)............................................ passim

*Fowler v. Guerin*,
  899 F.3d 1112 (9th Cir. 2018) ....................................................... passim

*Gabriel v. Alaska Elec. Pension Fund*,
  773 F.3d 945 (9th Cir. 2019) ............................................................. 12

*Goldberg v. Frerichs*,
  912 F.3d 1009 (7th Cir. 2019) ................................................. 11, 12, 19

*Gore v. Glickman*,
  137 F.3d 863 (5th Cir. 1998) ............................................................... 4

*Holabird v. Kagin*,
  829 Fed.Appx. 194 (9th Cir. 2020)...................................................... 21

*Homestreet Inc. v. Dept. of Revenue*,
  166 Wn.2d 444 (2009) ......................................................................... 4

*Kissell v. Gressley*,
  591 F.2d 47 (9th Cir. 1979) ............................................................... 21

*Mandarini v. Accurate Engineered Concrete, Inc.*,
  433 F.Supp.3d 186 (D.Mass. 2019) ................................................... 17

*Phillips v. Washington Legal Foundation*,
  524 U.S. 156 (1998)............................................................. 6, 7, 11, 19

*Schneider v. California Dep't of Corrections*,
  151 F.3d 1194 (9th Cir. 1998) ..................................................... 11, 19

*Schneider v. County of San Diego*,
  285 F.3d 784 (9th Cir. 2002) ............................................................. 19

*Signa Corp. v. Amara*,
  131 S.Ct. 1866 (2011)......................................................................... 12

*Taylor v. Westly*,
  402 F.3d 924 (9th Cir. 2005) ....................................................... 12, 19

*U.S. Commodity Futures Trading Comm'n v. Crombie*,
  914 F.3d 1208 (9th Cir. 2019) ..................................................... 13, 14

*Webb's Fabulous Pharmacies v. Beckwith*,
  449 U.S. 155 (1980)..................................................................... 11, 19

**Statutes**

28 USC § 1927 ....................................................................................... 3

RCW 41.32.8401 ........................................................................... 7, 8, 10

RCW 41.34.090 .......................................................................... 14, 16

RCW 41.34.100 ...................................................................................... 9

**MOTION TO DETERMINE FORMULA** - iii
3:15-cv-05367-BHS

RCW 41.34.120 ................................................................................................ 4, 12

RCW 41.34.130 .................................................................................................... 20

RCW 41.45.150 .................................................................................................... 17

RCW 41.45.155 .................................................................................................... 17

RCW 41.50.020 .................................................................................................... 13

RCW 41.50.030 .................................................................................................... 13

RCW 41.50.145 ......................................................................................... 13, 14, 16

RCW 43.33A.110 .................................................................................................. 20

RCW 43.33A.140 .................................................................................................. 20

**Other Authorities**

3 *Newberg on Class Actions* (4th ed. 2002) ........................................................ 21

IRS, Retirement plans FAQs regarding governmental plans and EPCRS (Jul. 22, 2024) ........... 15

IRS, Revenue Procedure 2021-30 ......................................................................... 15

*Restatement (Third) of the Law of Restitution and Unjust Enrichment* (2011) ........................ 14

*Restatement (Third) of Trusts* (2007) ........................................................... 12, 20

WSIB, *Vision, Mission, Values* .......................................................................... 20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

**MOTION TO DETERMINE FORMULA** - iv
3:15-cv-05367-BHS

**STOBAUGH & STRONG, P.C.**
126 NW CANAL STREET, SUITE 100
SEATTLE, WASHINGTON 98107
(206) 622-3536

1

## Matter Before the Court

2      Mickey Fowler, Leisa Maurer, and the class of public school teachers (hereafter "the

3  teachers") move to approve the formula for an injunction requiring the Director to correct the

4  accounting of funds held in the Teachers Retirement System (TRS) Plan 2/3 trust fund and credit

5  funds to the teachers' TRS Plan 3 accounts necessary due to DRS's taking of interest. *Fowler v.*

6  *Guerin*, 899 F.3d 1112, 1120 (9th Cir. 2018), rehearing en banc denied, 918 F.3d 644 (2019),

7  certiorari denied, 140 S.Ct. 39 (2019). Several years later, the Ninth Circuit ruled on the 2018

8  mandate, reversed this Court's dismissal of the teachers' case on statute of limitations grounds,

9  and remanded for the Court to decide "whether to approve the Teachers' proposed formula to

10  correct the Teachers' accounts" to correct the accounts so those who transferred from TRS Plan

11  2 to individual TRS Plan 3 accounts. *Fowler v. Guerin*, 2024 WL 4891016 at *3 and n.2 (9th

12  Cir. No. 23-35414, Nov. 26, 2024), rehearing en banc denied, Jan. 8, 2025. The Ninth Circuit

13  also affirmed the Court's 2021 rulings that the teachers had established a taking of interest as a

14  matter of law and that the transfer incentive payment is a separate obligation owed to the

15  teachers that cannot be used to offset the amount of interest that the Director kept to pay benefits

16  to others. *Id.* at *2. Plaintiffs ask the Court to approve the formula explained below.

17  ## Issue Presented and the Parties' Positions

18      The recent Joint Status Report (Dkt. 183, filed February 13, 2025) summarizes the

19  parties' positions on this motion. The plaintiff teachers said that they would file this motion on

20  the formula, and that DRS had already received extensive discovery and taken the deposition of

21  plaintiffs' expert actuary. JSR at 2. DRS says that the Ninth Circuit's 2018 remand to consider

22  whether "the class shall be given the requested injunctive relief," even after the second remand,

23  *still* leaves everything open for argument—*i.e.*, the taking itself, the rejected offset defense, and

24  the sovereign immunity defense. *Id.* at 4. And it says that discovery "commenced" last month

25

26

27

1   when plaintiffs re-sent a few 2023 state court discovery requests to DRS.[1]  *Id.*  DRS says that

2   "[f]actual discovery has not been completed and expert discovery has not really begun."  *Id.* at 3.

3   This is false; in 2020-21 DRS provided the teachers with *all* the data used in this formula

4   pursuant to the Ninth Circuit's 2018 remand and this Court's orders.  *Fowler*, 899 F.3d at 1120-

5   21; Minute Order, 12/19/19; Dkt. 88 (Minute Order, 12/4/21).  And DRS conducted

6   comprehensive and thorough discovery of plaintiffs' expert actuary, John Marshall, in both state

7   and federal court from 2021-23.  Dkt 183 (JSR) at 2, 3.  And DRS submitted its own expert

8   actuary and statistical testimony and opinions on the formula.  Dkts. 101 and 122 (Scott Miller);

9   Dkts. 138 and 149 (Stefan Boedeker).  Now it is time to determine the formula based on the

10  briefs and evidence in this motion (*Fowler v. Guerin*, 2024 WL 4891016 at *2-3):

> [T]he only remaining issue for the district court to resolve is whether to approve
> the Teachers' proposed formula to correct the Teachers' accounts.[n.2]
>
> [n.2] In *Fowler I*, we stated that prospective injunctive relief "will likely involve
> applying a computerized formula to [the] DRS['s] electronic records to determine
> the amount of interest that should be moved to class members'…[P]lan 3
> accounts." 899 F.3d at 1120 (some alterations in original).

15  DRS doubly disagrees with the Ninth Circuit's latest mandate—to decide "whether to

16  approve the Teachers' proposed formula"—saying discovery has just commenced and the merits

17  of both the taking and the rejected defenses will still be argued and tried (JSR at 4):

> [F]act discovery has [now] commenced. On January 31, 2025, Plaintiffs served
> interrogatories and requests for documents which, among other things, seek
> Defendant's method for computing the "amounts of omitted interest, omitted
> transfer payment, and/or investment returns" (*i.e.*, prejudgment interest).
> ***
> Defendant will make a record that there were no funds "skimmed" from member
> accounts, that Plaintiffs received all funds available at the time of the transfer, and
> that any "injunction" entered by the Court will necessitate an appropriation of
> public funds.

---

[1] In state court, the teachers filed a similar motion on the formula in 2023 while this case
was on appeal and submitted some discovery to DRS.  The state case is now in briefing while
DRS pursues discretionary review and the teachers seek dismissal.  Wash. App. No. 59097-2-II
(Order of Feb. 13, 2025).

**MOTION TO DETERMINE FORMULA** - 2
3:15-cv-05367-BHS

STOBAUGH & STRONG, P.C.
126 NW CANAL STREET, SUITE 100
SEATTLE, WASHINGTON  98107
(206) 622-3536

1    DRS's current argument that discovery has not been done and everything is open for

2    argument, discovery, and trial closely echoes its argument after the Ninth Circuit's 2018

3    mandate.  Then, DRS, when moving then to amend its answer to assert the statute of limitations,

4    maintained that it had not unduly delayed the amendment until after remand because nothing was

5    foreclosed by the Ninth Circuit mandate and the case was in its "early stages." Dkt. 78 at 4.

6    Then, as now, DRS falsely told the Court that "[t]he parties have not engaged in any formal

7    discovery, such as requests for production, interrogatories [and] deposition…" *Id.*  Therefore, it

8    asserted, there was no undue delay.  *Id.*

9        DRS's statements about discovery in 2020 were entirely false since discovery had long

10   before been thoroughly and comprehensively completed, from  2003 to 2005.  *Probst v. DRS*,

11   167 Wn.App. 180, 184 (2012) (*Probst I*); Dkt. 15 (JSR) at 2-3.  Thus when this federal case was

12   filed in 2015, the parties stipulated that discovery was fully sufficient for the legal issues, and

13   discovery would only be needed in the second phase—calculating the amount owed.  Dkt. 15

14   (JSR) at 2.

15       DRS's misrepresentation to the Court in 2020 in support of its motion to amend—that

16   nothing had been accomplished or decided from 2003 through 2020—resulted in a years-long

17   detour that has now been ended by the Ninth Circuit's second decision.  *Fowler*, 2024 WL

18   4891016 at *2-3.  DRS is now making the same kind of misrepresentations about (1) what is

19   open to be decided in this case, and (2) on the supposed lack of discovery and fact development

20   it participated in.[2]  Accordingly, plaintiffs will briefly summarize what has already been done.

21                      **<u>Matters Already Established</u>**

22       This case began in administrative proceedings before the Department of Retirement

23   Systems in 2003-05.  There, daily interest was sought for employees transferring from a Plan 2

24

25       [2] Further efforts by DRS to relitigate the matters already decided (including the taking
     itself, the offset defense, and sovereign immunity) should be met with sanctions.  *BKB v. Maui
26   Police Dept.*, 276 F.3d 1091, 1106-09 (9th Cir. 2002); 28 USC § 1927.

27

**MOTION TO DETERMINE FORMULA** - 3
3:15-cv-05367-BHS

STOBAUGH & STRONG, P.C.
126 NW CANAL STREET, SUITE 100
SEATTLE, WASHINGTON  98107
(206) 622-3536

defined benefit account to a Plan 3 defined contribution account.  Dkt. 15 (JSR) at 2; *Fowler v. Frost*, 2015 WL 930486 at *1, n.1 (W.D. Wash. Dec. 22, 2015).

There are over 20,000 teacher class members in this case.  *Fowler v. Guerin*, 2019 WL 3337964 at *3 (W.D. Wash. July 25, 2019).[3]  For the vast majority of these teachers, the transfers from TRS Plan 2 to TRS Plan 3 occurred in 1996-98 when the accumulated contributions plus interest were transferred from TRS Plan 2 to TRS Plan 3.  *Probst I*, 167 Wn.App. at 184-85.  The amount transferred at that time did not include daily interest.  *Id.* at 185.

The contributions plus interest in the teachers' individual accounts are their funds, "not state funds."  *State Ret. Board v. Yelle*, 31 Wn.2d 87, 110-11 (1948); *Bowles v. DRS*, 121 Wn.2d 52, 75 (1993).  The teachers' funds in their Plan 3 accounts are held in trust.  *Fowler*, 899 F.3d at 1115, 1120; RCW 41.34.120.

The teachers made monthly contributions to their Plan 2 accounts "from each paycheck." *Fowler*, 2019 WL 3337964 at *1.  These contributions were made from the date of hire to the date of transfer to TRS Plan 3 and those contributions since 1977 earned interest at the rate of 5.5% annual interest compounded quarterly.  *Fowler*, 899 F.3d at 1115; Dkt. 18 at 4 (Admission No. 1 from administrative proceedings in 2004).  "All contributions were transferred to a state-managed comingled trust fund for investment purposes."  *Fowler v. Guerin*, 2021 WL 228900 at *1 (W.D. Wash. Jan. 22, 2021); Dkt. 18, App. p. 1 (Admission No. 2 from administrative proceedings in 2004).

Although the teachers' accounts earned interest,[4] DRS did not credit the teachers'

---

[3] The "20,000 class members" figure stated in the class certification order was based on an estimate before receiving class member data.  The data provided by DRS show there are 26,785 class members.  Marshall [2/20/25] Dec., ¶32.

[4] The point of interest is "to compensate one for the time value of money."  *Gore v. Glickman*, 137 F.3d 863, 868 (5th Cir. 1998); *Homestreet Inc. v. Dept. of Revenue*, 166 Wn.2d 444, 453 (2009).  Thus, an "interest rate" is the measure of how much interest will accrue over time on a given amount of money and "time" for an interest rate is measured in days.  *O'Brien v.*
(continued)

**MOTION TO DETERMINE FORMULA** - 4
3:15-cv-05367-BHS

STOBAUGH & STRONG, P.C.
126 NW CANAL STREET, SUITE 100
SEATTLE, WASHINGTON  98107
(206) 622-3536

individual accounts with all the interest their accounts earned by simply not crediting interest daily. Instead, DRS used an odd crediting method explained by the Ninth Circuit (899 F.3d at 1115):

> DRS determines the amount of interest to credit to Plan 2 accounts based on the accounts' balances at the end of the prior quarter. Therefore, DRS does not credit accounts with the interest earned on the funds in the account during that quarter. In addition, if a Plan 2 account has a zero balance at the end of a quarter, the account is not credited with interest earned on any funds in that account during either that quarter or the prior quarter.

See also Dkt. 13 (Answer), ¶¶37-42.

Thus, "[i]t is undisputed that DRS did not pay the Teachers daily interest." *Fowler*, 2024 WL 4891016 at *2; *Fowler v. Guerin*, 2021 WL 3129626 at *2 (W.D. Wash. July 23, 2021). Instead, DRS "skimmed" the daily interest earned on the teachers' accounts and used it "for other members." *Fowler*, 899 F.3d at 1115, 1120; *Fowler*, 2024 WL 4891016 at *2; Dkt. 18 at 103, 136.

The Ninth Circuit found that a taking had occurred because daily interest is a core property right protected by the Takings Clause. 899 F.3d at 1118-19; 2024 WL 4891016 at *2-3, affirming this Court; *Fowler*, 2021 WL 3129626 at *3.

Because the vast majority of the teachers transferred in 1996-98, the teachers have been deprived of their interest for a very long time (at least 26 years) during which their funds were invested in the Commingled Trust Fund earning compounded investment returns over the many years they were held in the trust fund. *Fowler*, 2021 WL 228900 at *1 (noting that "[a]ll contributions" are in at "state-managed comingled trust fund").

---

*Shearon Hayden Stone*, 90 Wn.2d 680, 691 (1978) (interest "per annum" means "by the year" and "a year is considered to be 365 days"); *American Timber & Trading Co. v. First Nat. Bank of Oregon*, 511 F.2d 980, 983-84 (9th Cir. 1973). Accordingly, the concept of annual interest inherently assumes that interest accrues daily because we calculate years in 365 days—the same as the common law rule, *de die in diem*. *Fowler*, 899 F.3d at 1119. Thus, any annual interest rate assumes that interest is accrued on each of the year's 365 days at the specified annual interest rate.

DRS recently determined that these funds in the Commingled Trust Fund earned an average of 8.92% interest for each year they were in the Fund. The determination by DRS is published on its website and a copy is attached to this motion. See also Stobaugh [2/20/25] Dec., ¶¶2-8; Marshall [2/20/25] Dec., ¶20

The Director stipulated at the outset of this case that if the teachers prevailed on liability they would seek a prospective injunction "applying a computerized formula to DRS electronic records to determine the amount of interest that should be moved to class members' TRS plan 3 accounts." Dkt. 15 at 2. The Ninth Circuit accepted the stipulation and affirmed that a formula would be used to calculate how to correct the loss of interest. 899 F.3d at 1120; 2024 WL 4891016 at *3, n.2.

The Ninth Circuit also rejected the Director's sovereign immunity defense, finding that the teachers are not seeking "just compensation" or monetary damages "requiring payment of funds from the State's treasury," rather they are seeking prospective injunctive relief correcting the accounting to credit their Plan 3 accounts with withheld interest skimmed from their accounts and held in the Commingled Trust Fund. 899 F.3d at 1120; 2019 WL 3337964 at *4. The Ninth Circuit reiterated that this case is about prospective injunctive relief when the Director raised it again in the last appeal. 2024 WL 4891016 at *3 and n.2.

Under *Phillips v. Washington Legal Foundation*, 524 U.S. 156, 168, 172 (1998), the teachers are entitled to the withheld daily interest and all the earnings that those funds earned while being withheld. What remains for the Court to decide now "is whether to approve the Teachers' proposed formula for prospective injunctive relief" and "[i]f approved...order the DRS to correct the Teachers' accounts." *Fowler*, 2024 WL 4891016 at *3.

### Summary of Formula

The formula here has three elements: (1) daily interest omitted to the time of transfer (daily interest on each employee contribution deposited in each quarter and quarterly compounding of the omitted interest), (2) an increase in the transfer incentive payment (RCW

41.32.8401) to account for the missing daily interest that should have been included in the transfer balance, and (3) the returns that the teachers' funds earned while sitting in the State's Commingled Trust Fund since the date of transfer to Plan 3 (at least 26 years for the vast majority of class members).[5]  These elements were identified by the Court back in 2021, where the Court summarized the teachers' request for " more interest upon transfer, [] a higher 'Transfer Payment' based on the additional interest, and [] earnings on the lost funds ever since." *Fowler*, 2021 WL 3129626 at *1.

The first two elements of the injunction formula were effectively resolved by the Court's ruling that the teachers had proven their taking claim for daily interest and its rejection of the Director's offset defense related to the transfer payment.  *Id.* at *2-3.  The Ninth Circuit affirmed both of these rulings.  *Fowler*, 2024 WL 4891016 at *2-3.

The third element is required by the Takings Clause.  The Supreme Court held in *Phillips*, 524 U.S. at 168, that interest is the property of the account owner and "regardless of whether the owner of principal has a constitutionally cognizable interest in the *anticipated* generation of interest by his funds, any interest that *does* accrue attaches as a property right incident to the ownership of the underlying principal."  *Id.* (Supreme Court's emphasis).  Thus, the "income generated by funds held in [government-managed] accounts is the 'private property' of the owner of the principal."  *Id.* at 172.  Accordingly, the fund's investment returns while held for over 26 years must be returned to the teachers.  It is also required by the TRS Plan 3 statute, by trust law, and by the law of restitution.

**Proposed Formula**

**I.    Problems the Formula Addresses**

TRS Plan 2 is a defined benefit retirement plan for teachers.  The teacher class members

---

[5] The accompanying declaration of actuary John Marshall explains the formula and applies it to all class members.  A spreadsheet listing the amounts to be transferred from TRS Plan 2 to each class member's TRS Plan 3 account is part of the Marshall testimony.  See *Fowler*, 2024 WL 4891016 at *3 and n.2.

---

**MOTION TO DETERMINE FORMULA** - 7
3:15-cv-05367-BHS

STOBAUGH & STRONG, P.C.
126 NW CANAL STREET, SUITE 100
SEATTLE, WASHINGTON  98107
(206) 622-3536

1  here transferred from TRS Plan 2 to TRS Plan 3.[6]  TRS Plan 3 is a hybrid retirement plan under

2  which the teachers have only one-half of the defined benefit of TRS Plan 2 plus a separate

3  defined contribution plan.  For these teachers, the defined contribution portion of TRS Plan 3 is

4  funded solely by employee contributions plus accrued interest.  In addition, under RCW

5  41.32.8401 these transferring teachers received an incentive payment to transfer, based on their

6  "transfer balance," *i.e.*, the amount of their employee contributions plus accrued interest at the

7  end of 1995.  RCW 41.32.8401; *Fowler*, 2021 WL 3129626 at *2-3, affirmed, 2024 WL

8  4891016 at *2-3.

   The initial problem was that the Director did not calculate interest properly because she

10  did not credit daily interest, but instead used a quarter-ending-balance crediting method,

11  described in the Ninth Circuit's opinion, *Fowler*, 899 F.3d at 1115, 1120.  This error in not

12  crediting interest reduced the amount in the teachers' accounts (the teachers' employee

13  contributions plus accrued interest on those contributions) and reduced the amount of the transfer

14  incentive payment.  And the skimmed-off interest was kept by DRS and held in the Commingled

15  Trust Fund for over 26 years.  To correct the Director's error, the formula has three components.

16  **II.    Components of the Formula**

17      **A.    First Component – Calculating Daily Interest**

18      The first component of the formula is calculating daily interest.  The DRS daily interest

19  error occurs with each teacher contribution because DRS did not credit interest to a deposit in the

20  quarter in which it was made.  *Fowler*, 899 F.3d at 1115.  Thus, for each teacher, DRS's

21  withholding of interest begins when the teacher makes each contribution, which occurs when the

22  funds are taken out of their monthly paycheck.  The first quarter-ending balance is wrong

23  because it only includes those deposits, but not the daily interest earned on those deposits during

24

---

25      [6] The State saved a very substantial amount and substantially lessened its pension
    obligations by creating TRS Plan 3 and getting teachers to switch to the new TRS Plan 3.  This is
26  explained by John Marshall in an earlier declaration. Dkt. 113 at 13-14.

27

MOTION TO DETERMINE FORMULA  -  8
3:15-cv-05367-BHS

the quarter, and this omission continues for each quarter of work thereafter. *Id.* The quarterly

compounding (earning interest on principal plus accrued interest) is accordingly also wrong for

each quarter. Moreover, *id.*, DRS did not credit the class members' accounts with interest on the

entire account balance (the previous quarter-ending balance plus contributions made during the

quarter) during the quarter of transfer to TRS Plan 3. Thus, the interest earned each quarter and

quarterly compounding for each quarter of the teacher's work needs to be calculated to the date

of transfer to correct each class member's final account balance.

Under the teachers' formula, daily interest begins to accrue when the retirement

contributions were deducted from the teachers' paychecks. Previously, when submitting

testimony to show the fact of loss, the teachers were using the "transaction dates" in the DRS

data file provided because DRS said that is "the date DRS received the member's TRS Plan 2

contribution." Later, in 2023, DRS said the "transaction date" is *not* the date when the funds are

received, *i.e.*, *not* the date of contribution. Stobaugh [2/20/25] Dec., ¶10 (referring to Blocki

Dec.). The best information available is the earnings period end date, where the employee

contributions are removed from the teachers' paychecks. Marshall [2/20/25] Dec., ¶30;

Stobaugh [2/20/25] Dec., ¶¶10-13. The withheld daily interest is calculated in the Marshall

[2/20/25] Dec., ¶33.

### B. Second Component – Accounting for the Daily Interest Missing from the Transfer Payment

The second element of the formula involves the incentive payment required by statute for

teachers who requested transfer from TRS Plan 2 to TRS Plan 3 before January 1, 1998. The

incentive payment became a contractual right on July 1, 1996. RCW 41.34.100. Under RCW

41.32.8401, the transferring teachers received an incentive payment in their TRS Plan 3 accounts

based on their account balance (accumulated contributions plus interest) on December 31, 1995,

called "Transfer Basis Amount" in the data for each class member provided by DRS described in

DRS's excel spreadsheet. *Fowler*, 2021 WL 3129626 at *3 ("the Legislature created a legal

right to very substantial Transfer Payments as an incentive for members who transferred from

**STOBAUGH & STRONG, P.C.**
126 NW CANAL STREET, SUITE 100
SEATTLE, WASHINGTON  98107
(206) 622-3536

1   Plan 2 to Plan 3"). The final account balance for the transfer payment includes contributions

2   made after December 31, 1995, but for work performed before December 31, 1995. Dkt. 142,

3   attaching as Exhibit 1 the July 19, 1995 decision statement by DRS, Bates Nos. 100186-90.

4   DRS provided the data needed to account for this in the earnings history data that it supplied.

5   Marshall [2/20/25] Dec., ¶26. Most class members received a payment of 65% of that balance, a

6   few were eligible to receive only 40%, and a small number were not eligible for any additional

7   payment. See RCW 41.32.8401. The data provided by DRS show which teachers were eligible

8   to receive 65%, 40%, or zero, depending on each teacher's status and transfer date. Marshall

9   [2/20/25] Dec., ¶15. The matter to be corrected is that DRS did not credit the right amount of

10  interest when it determined the Final Account Balance as of December 31, 1995, called the

11  Transfer Basis Amount.

12         Thus, to correct DRS's error in not crediting daily interest, one must determine for each

13  class member the missing interest up to December 31, 1995 to determine the correct account

14  balance on that date. DRS's Final Account Balance on December 31, 1995 is then subtracted

15  from the Final Account Balance on that date when the missing interest is added. The difference

16  is then multiplied by the appropriate transfer payment percentage, 65% or 40% or 0%, which is

17  the amount added to the accumulated contributions under RCW 41.32.8401. Marshall [2/20/25]

18  Dec., ¶¶15-16.

19         The total amount of funds transferred by DRS at the time of the transfers in 1996-98

20  (accumulated contributions plus accrued interest plus transfer incentive payment) was short

21  because of the error in properly crediting daily interest and because the transfer payment was

22  short due to uncredited daily interest. This amount is calculated in the Marshall [2/20/25] Dec.,

23  ¶¶35-36.

24         **C.    Third Component – Investment Returns in the Commingled Trust Fund**

25         The final element in the formula is to calculate the teachers' withheld earnings for the

26  period from the date of transfer to Plan 3 to the date of account correction. During this time the

27

STOBAUGH & STRONG, P.C.
126 NW CANAL STREET, SUITE 100
SEATTLE, WASHINGTON  98107
(206) 622-3536

1    teachers' funds (the amount withheld described above) were held in the Commingled Trust Fund

2    where the teachers' money earned investment returns for the trust fund for over 26 years.  For

3    several independent reasons, leading to the same outcome, the teachers' funds must be returned

4    with the gains DRS obtained by this withholding.

5           Most importantly, turning over the actual earnings on the teachers' funds is required by

6    the Takings Clause because these earnings are the property of the teachers.  The Supreme Court

7    in *Phillips* concluded that individuals have a protected *property right to the income earned* on

8    their funds in government-managed accounts because the rule that "interest follows principal" is

9    a core property right established in the English common law since at least the mid-1700s.

10   *Phillips,* 524 U.S. at 165.  As the Supreme Court explained, "[*t*]*he earnings of a fund* are

11   incidents of ownership of the fund itself and *are property just as the fund itself* is property."

12   *Webb's Fabulous Pharmacies v. Beckwith,* 449 U.S. 155, 164 (1980) (emphasis added).  The

13   "income generated by funds held in [government-managed] accounts is the 'private property' of

14   the owner of the principal." *Phillips*, 524 U.S. at 172.  Accordingly, "any interest that *does*

15   accrue attaches as a property right incident to the ownership of the underlying principal." *Id.* at

16   168 (emphasis by Supreme Court).

17          The Ninth Circuit recognized that in both *Webb's* and *Phillips* "the [Supreme] Court

18   relied…upon the traditional common law rule that 'interest follows principal' in recognizing a

19   protected *property right in earned income*." *Schneider v. California Dep't of Corrections*, 151

20   F.3d 1194, 1200 (9th Cir. 1998) (emphasis added).  The Ninth Circuit in *Fowler* followed

21   *Schneider* and *Phillips* in holding there was a taking in this action.  899 F.3d at 1118-19; 2024

22   WL 4891016 at *2-3.

23          The Fifth Amendment's Takings Clause thus requires not just return of the omitted daily

24   interest, but also the earnings generated by the withheld interest while it was wrongly held by the

25   government.  *Phillips*, 524 U.S. at 168, 172; *Goldberg v. Frerichs*, 912 F.3d 1009, 1009-12 (7th

26   Cir. 2019) (a state may not take custody of property and retain income that it earns).  *Goldberg*

27

MOTION TO DETERMINE FORMULA  -  11
3:15-cv-05367-BHS

STOBAUGH & STRONG, P.C.
126 NW CANAL STREET, SUITE 100
SEATTLE, WASHINGTON  98107
(206) 622-3536

said that the Takings Clause requires the government "to turn any gain over to the owner." 912 F.3d at 1011. It is "vital" to do so. *Id.* This follows *Phillips*'s holding that all earnings on a person's funds belong to the account owner, not the agency holding and investing the funds.

Second, the teachers' funds are held in trust for members, bringing the principles of trust law into the case. The Plan 3 statute, RCW 41.34.120, states:

> *All moneys in member accounts*, all property and rights purchased therewith, *and all income attributable thereto*, *shall be held in trust* by the state investment board… [Emphasis added.]

The state investment board thus holds and invests the teachers' money in its Commingled Trust Fund, while DRS tracks teachers' contributions and credits their individual accounts for accumulated interest. *Fowler*, 899 F.3d at 1115. See also 899 F.3d at 1120, quoting *Taylor v. Westly*, 402 F.3d 924, 932 (9th Cir. 2005) ("Money that the state holds in custody for the benefit of private individuals is not the state's money…").

Return of the gains on the teachers' withheld funds is also required by trust law. The Ninth Circuit determined that the Director breached her duty to teachers by keeping their withheld interest in the Commingled Trust Fund, instead of crediting the interest to the teachers' TRS Plan 3 accounts. *Fowler*, 899 F.3d at 1118-19; *Fowler*, 2024 WL 4891016 at *2-3. And under trust law, when a trustee breaches a duty, courts "'provide relief in the form of monetary compensation for a loss resulting from a trustee's breach of duty, and to prevent unjust enrichment.'" *Gabriel v. Alaska Elec. Pension Fund*, 773 F.3d 945, 957 (9th Cir. 2019), quoting *Signa Corp. v. Amara*, 131 S.Ct. 1866, 1880 (2011); *In re Wash. Builders Benefit Trust*, 173 Wn.App. 34, 81-82 (2013) (trustee who breaches fiduciary duty required to return the interest earned by a trust fund that the trustee wrongfully retained"); *Restatement (Third) of Trusts*, § 76(2)(c), p. 68 (2007). Accordingly, under trust law the Director must return to the TRS Plan 3 members the gains made on their funds in the Commingled Trust Fund.

The Plan 3 statute also requires return of the income received on the teachers' withheld funds. RCW 41.34.120 ("all income attributable" to members' accounts "shall be held in trust");

STOBAUGH & STRONG, P.C.
126 NW CANAL STREET, SUITE 100
SEATTLE, WASHINGTON  98107
(206) 622-3536

1    RCW 41.50.145(2) (when a DRS error causes a "loss of investment return," it must credit the

2    amount necessary from the Plan 2/3 trust fund to correct the error).

3        DRS has recently determined—as of December 31, 2024—the investment gains (net of

4    fees) that the teachers' funds earned in the Commingled Trust Fund.  The daily interest that DRS

5    kept has earned investment gains at the annual rate of 8.92% during the over 26 years they have

6    been in the Commingled Trust Fund.  DRS publishes this determination on its website.  A copy

7    is attached as an appendix.  Thus, DRS has determined precisely the amount of investment gains

8    to be returned to the teachers.[7]  Stobaugh [2/20/25] Dec., ¶¶5-7; Marshall [2/20/25] Dec., ¶20.

9        Moreover, the principles above are consistent with the general common law of restitution.

10   Measuring a loss by the amount DRS gained from its investment of the teachers' withheld funds

11   is appropriate since the wrongdoer would otherwise retain the benefits of the wrongdoing.  The

12   Ninth Circuit explained (*U.S. Commodity Futures Trading Comm'n v. Crombie*, 914 F.3d 1208,

13   1216 (9th Cir. 2019)):

14       Restitution is a remedy designed to prevent a defendant from unjustly enriching
         himself at another's expense. *Restatement [Third] of Restitution* §§ 1, 3, 49.
15       Where a defendant has profited from his wrongful actions, restitution can take the
         form of an order requiring the defendant to disgorge those wrongfully gotten
16       profits and transfer them to the victims. *Id.* § 51(4); *see also Co Petro Mktg. Grp.*,
         680 F.2d at 583.
17

18
     _____

19       [7] DRS manages TRS Plan 3 accounts.  RCW 41.50.020; -.030; Stobaugh [2/20/25] Dec.,
     ¶3.  One of the TRS Plan 3 investments for teachers is the Total Allocation Portfolio (TAP),
20   which is one of the funds within the Washington State Investment Board's Commingled Trust
     Fund.  Since TAP is an undifferentiated part of the Commingled Trust Fund, its investments and
21   returns are the same as those of the Commingled Trust Fund.  TAP "is identical to the
     Commingled Trust Fund (CTF)."  Stobaugh [2/20/25] Dec., ¶4.
22
         DRS determines the investment returns for TAP and publishes them on its website,
23   making them available to TRS Plan 3 members to explain the TAP's returns.  The published
     returns are net of fees and they show that the TAP (which has identical investments and returns
24   as the Commingled Trust Fund) has earned annualized returns of 8.92% since TAP's inception in
     1992.  *Id.*, ¶¶5-6.
25
         Thus, DRS has determined precisely the investment gains to be returned to the teachers.
26   *Id.*, ¶7.

27

**MOTION TO DETERMINE FORMULA** - 13
3:15-cv-05367-BHS

STOBAUGH & STRONG, P.C.
126 NW CANAL STREET, SUITE 100
SEATTLE, WASHINGTON  98107
(206) 622-3536

1    This principle is stated in *Restatement (Third) of the Law of Restitution and Unjust Enrichment*

2    §53 (2011).  "A person who is liable to make restitution of property or its value" is liable for

3    "consequential gains." *Id.*, §53, p. 244.  "Consequential gains are profits realized through the

4    defendant's subsequent dealings with such an asset…" *Id.*, § 53(2) and (3).  Without such

5    restitution, the defendant is unjustly enriched.  *U.S. Commodity Futures v. Crombie*, 914 F.3d at

6    1216; *Nelson v. Appleway Chev.*, 160 Wn.2d 173, 187-88 (2007); *Moore v. HCA*, 181 Wn.2d

7    299, 311, 314 (2014).

8        Moreover, the IRS correction procedure for retirement plans also requires the correction

9    of accounts to include all gains lost due to an operational error, and the Washington Legislature

10   mandated that this procedure be followed.  The Legislature mandated in the Plan 3 statute that

11   any investment returns lost due to a DRS error be corrected by crediting the member with money

12   out of the TRS Plan 2/3 trust fund.  RCW 41.50.145(2); *Fowler*, 899 F.3d at 1120; *Fowler*, 2024

13   WL 4891016 at *3, n.2.  The Plan 3 statute specifically incorporated the IRS procedure,

14   requiring that the statute "shall be administered" in accordance with the "plan qualification

15   requirements imposed on government plans under section 401(a) of the Internal Revenue Code."

16   RCW 41.34.090(1).  The plan must be construed to satisfy requirements of the tax code, and if

17   any conflict exists, the conflicting part is "inoperative."  RCW 41.34.090(2) and (3).  DRS

18   Assistant Director Seth Miller explained that "RCW 41.34.090 reflects the priority that the State

19   places on qualifying its retirement plans under federal tax law."  Dkt. 99 (Seth Miller Dec.), ¶11.

20       RCW 41.34.090 thus requires DRS to comply with Internal Revenue Service plan

21   qualification requirements for IRS Code § 401(a) government plans such as TRS Plan 3.[8]  TRS

22

23       [8] The IRS explained (FAQ Regarding Government Retirement Plans): "State

24   constitutions, statutes, and state court cases often provide participants with some protection or
     guarantee of their state provided retirement benefits.  These *governmental plans must satisfy a*

25   *number of tax-qualification requirements under the Internal Revenue Code*, including the benefit
     and contribution limits of section 415 and the compensation limits under section 401(a)(17).

26   *These plans must also follow their plan terms to retain their tax-qualified status* so that the
     participants receive favorable tax treatment on their benefits and contributions…Under some

27                                                                                      (continued)

**MOTION TO DETERMINE FORMULA** - 14
3:15-cv-05367-BHS

STOBAUGH & STRONG, P.C.
126 NW CANAL STREET, SUITE 100
SEATTLE, WASHINGTON  98107
(206) 622-3536

1   Plan 3's operational error in failing to credit daily interest must be corrected, including turning

2   over the gains on these funds received by the plan due to the error. The IRS Employee Plans

3   Compliance Resolution System (EPCRS), to which government plans such as TRS are subject, is

4   found in Revenue Procedure 2021-30 (https://www.irs.gov/pub/irs-drop/rp-21-30.pdf). Under

5   the correction principles "a failure is not corrected unless full correction is made with respect to

6   all participants and beneficiaries, and for all taxable years[.]" *Id.*, Sec. 6, *Correction Principles*

7   *and Rules of General Applicability*, p. 28. The correction for lost investment gains when there

8   are multiple possible investments uses "the rate of return of the fund with the highest rate of

9   return under the plan for the period of the failure may be used to determine the Earnings rate for

10  all corrective contributions or allocations." *Id.*, App. B, Sec. 3.01(3)(b), p. 119. When there are

11  multiple years of lost earnings, the Earnings Rate is determined for each year the corrective

12  contributions would have earned interest and that amount is added to the employees' accounts.

13  *Id.*, Sec. 3.02, Examples 28 and 29, pp. 121-23. Here, DRS has determined the earnings rate—

14  8.92% for each year that the teachers' funds were involuntarily invested in the Commingled

15  Trust Fund/TAP, at least 26 years for most class members.

16       The Ninth Circuit held there was an error in crediting daily interest. *Fowler*, 899 F.3d at

17  1118-19; *Fowler*, 2024 4891016 at *2-3. DRS agrees a plan correction must be made:

18  "[b]ecause the Ninth Circuit has held that it was an error for the Director not to credit daily

19  interest to members' accumulated contribution accounts, it is instructive to consider generally

20  accepted correction methods for qualified retirement plans," which he identified as "[t]he

21  Employee Plans Compliance Resolution System [EPCRS]." Dkt. 122 (DRS actuary Scott Miller

22  circumstances, the state provided benefits under the plan [could] conflict with the Internal
    Revenue Code requirements. Revenue Procedure 2021-30, containing the provisions of the

23  Employee Plans Compliance Resolution System (EPCRS), provides that generally, "*a failure is*

24  *not corrected unless a full correction is made with respect to all participants and beneficiaries,*
    *and for all taxable years (whether or not the taxable year is closed).*" [Emphasis added.] IRS,

25  Retirement plans FAQs regarding governmental plans and EPCRS (Jul. 22, 2024),

26  https://www.irs.gov/retirement-plans/retirement-plans-faqs-regarding-governmental-plans-and-
    epcrs.

27

**MOTION TO DETERMINE FORMULA** - 15
3:15-cv-05367-BHS

1    Dec.), ¶28. And DRS's statistical expert agrees that investment returns are necessary to correct

2    the error.[9]

3          State law is also in accord. RCW 41.34.090 (requiring that the TRS Plan 3 statute be

4    administered and construed to comply with IRS requirements); RCW 41.50.145(2) (correcting

5    loss of investment returns in TRS Plan 3 accounts). When, "due to departmental error a member

6    of plan 3 has suffered a loss of investment return," DRS must determine and then credit the

7    members account the amount "necessary to correct the error." RCW 41.50.145(2).

8          Thus, under Takings Clause law, the law of trusts, state law (including the IRS correction

9    procedures it incorporated), the Plan 3 statute, and the remedy of restitution, the teachers are

10    entitled to the gains that their funds earned while they were involuntarily invested in the

11    Commingled Trust Fund/TAP.

12    **III.    Application of the Formula**

13          The formula above is applied by plaintiffs' expert witness actuary John Marshall, as is

14    explained in his declaration. Mr. Marshall has made the most accurate possible calculation with

15    the data provided. The calculation is made to a reasonable professional certainty based on

16    information provided by DRS. Accompanying the declaration is a spreadsheet setting forth for

17    each class member the amount to be transferred from TRS Plan 2 to the class member's TRS

18    Plan 3 account. The Director long ago agreed that this relief is appropriate if the teachers

19    established that a taking occurred. Dkt. 15 (JSR) at 2. The Ninth Circuit twice referred to the

20    Director's stipulation that relief involves crediting of earnings from the TRS Plan 2/3 trust fund

21    to the teachers' TRS Plan 3 accounts. *Fowler*, 899 F.3d at 1120; *Fowler*, 2024 WL 4891016 at

22

23         [9] But instead of using the actual returns earned on the teachers' funds, Boedeker's

24    proposed method, incorrectly speculates about what investment returns the 26,785 individual teachers may have obtained if their accounts actually had been credited with daily interest. He

25    does this without knowledge of the actual individual returns for the Plan 3 class member, trying to estimate the returns based on contributions and withdrawals to individual accounts, not actual

26    returns in the accounts. His highly speculative counterfactual is contrary to the principles governing how to correct a failure to credit investment returns.

27

**MOTION TO DETERMINE FORMULA** - 16
3:15-cv-05367-BHS

1    *3, n.2.

2         The calculation is based on records provided by DRS.  The calculation is a summary

3    under Evidence Rule 1006 of voluminous records for the entire time that the class members were

4    in TRS Plan 2.  The calculation could be done by hand, person-by-person, pay-period-by-pay-

5    period, but that calculation would not be feasible for our 26,000 class members.  And so Mr.

6    Marshall used a computer to do the same calculation, as would be done by hand, person-by-

7    person.  See, *e.g.*, *Mandarini v. Accurate Engineered Concrete, Inc*., 433 F.Supp.3d 186, 206-07

8    (D.Mass. 2019); *Chavez v. IBP, Inc.*, 2005 WL 8158586 at *1 (E.D. Wash. May 18, 2005).  This

9    type of calculation is required by the Ninth Circuit mandate.  2024 WL 4891016 at *3, n.2.

10        The calculation shows that $137,616,369 needs to be transferred from the TRS Plan 2/3

11   trust fund to the teachers' TRS Plan 3 accounts.  This is a substantial sum, but nearly all of it is

12   due to DRS's extremely long delay (over 26 years) in correcting its daily interest error.  Nearly

13   all the teacher transfers occurred in 1996-98.  At that time, the amount of daily interest owed to

14   the teachers was $10,078,049 and an additional $3,127,947 for the transfer incentive payment.

15   The remaining $124,410,373 is for the long period that the teachers' funds were invested in the

16   Commingled Trust Fund/TAP, earning investment returns for the fund that were compounded

17   each year at 8.92%.

18        The Director in the joint status report states that "any 'injunction' entered by the Court

19   will necessitate an appropriation of public funds."  Dkt. 183 (JSR) at 4.  This is a rehash of the

20   Director's Eleventh Amendment sovereign immunity argument rejected by the Ninth Circuit.

21   *Fowler*, 899 F.3d at 1120.  It is also plainly incorrect because the Washington TRS plan is

22   funded entirely by contributions from school district employers and their employees, not by

23   legislative appropriations.  RCW 41.45.150(6); RCW 41.45.155(4).  Indeed, the State Actuary

24   explains that "[i]n only the LEOFF plans, the state pays a percent of the total cost of benefits."

25   Office of the State Actuary, *Contribution rates projections* (Stobaugh [2/20/25] Dec., ¶17, Ex.

26   F).

27

**MOTION TO DETERMINE FORMULA** - 17
3:15-cv-05367-BHS

1    Moreover, the mandated transfer returning the teachers' fund is very small in relation to

2    the size of the commingled trust fund and will occur in a context where contribution rates are

3    projected to be going down.  DRS's Annual Comprehensive Financial Report shows that TRS

4    Plan 2 had over $27 billion in assets.  *2024 Annual Comprehensive Financial Report*, at 31

5    (Stobaugh [2/20/25] Dec., ¶18, Ex. G).  The teachers' funds to be moved in this accounting total

6    $137,616,369, about 0.5% of the TRS Plan 2/3 assets.  This is a very small portion of the fund.

7    The transfer returning of the teachers' funds will be made in the context where the State Actuary

8    is predicting contribution rates to go down.  The State Actuary's "best estimate" is that TRS

9    contribution rates will decrease about 0.4% from the current rates for the 2025-2027 biennium.

10   *Contribution rates projection* (TRS employer contributions are projected to decrease .42% from

11   9.26% to 8.84%).

12   In any event, the earnings were made on the teachers' funds, and the gains are theirs.

13   And the teachers' earnings have been kept in a trust fund "used 'to pay benefits to other

14   members,'" *Fowler*, 2024 WL 4891016 at *2, quoting *Fowler*, 899 F.3d at 1115.  The teachers'

15   proposed formula correctly accounts for the funds to be credited to TRS Plan 3 member

16   accounts.

17   **IV.    The Director's Quibbles Do Not Provide a Basis for Denying the Teachers' Motion
18           to Approve the Formula**

19   Previously, in opposing the teachers' motion to approve the formula, the Director argued

20   that the "Ninth Circuit has established the standard that controls Plaintiffs' claim for investment

21   returns…[i]n *Schneider v. County of San Diego*, 285 F.3d 784 (9th Cir. 2002)."  Dkt. 135 at 17.

22   When the parties conferred about the recent joint status report, defense counsel said that the

23   Director maintains that *Schneider* is "controlling."

24   *Schneider*, however, has nothing to do with whether the teachers should receive the

25   investment returns earned on their funds in the Commingled Trust Fund/TAP.  It did not involve

26   such a situation at all.  In *Schneider*, the County had taken a car for which the plaintiff was

27   seeking just compensation.  A jury determined the amount of just compensation after trial.  Here,

**MOTION TO DETERMINE FORMULA** - 18
3:15-cv-05367-BHS

the teachers are not seeking compensation; rather, they seek crediting to their accounts of the funds taken from them and invested by DRS in the Commingled Trust Fund. This Court agreed (*Fowler*, 2021 WL 228900 at *5):

> Plaintiffs are correct that in *Eastern Enterprises v. Apfel*, 524 U.S. 498, 521 (1998), the Supreme Court reasoned that a claim for compensation is "pointless" when the government has directly taken money.

The issue in *Schneider v. County of San Diego* was whether the district court had correctly determined the amount of prejudgment interest on the money judgment for just compensation. In federal court, prejudgment interest is discretionary. The Ninth Circuit held in *Schneider* that the district court had not properly calculated prejudgment interest. The Court remanded, directing the district court to determine an appropriate prejudgment interest rate "under the reasonably prudent investor standard," *Schneider*, 285 F.3d at 794, by "investing funds so as to produce a reasonable return while maintaining safety of principal." *Id.* at 793.

Here, the teachers are not seeking prejudgment interest on a money judgment for just compensation. Rather, as part of prospective injunctive relief, the teachers seek crediting to their accounts of the funds withheld from them and the earnings that those funds actually earned in the Commingled Trust Fund. This is required by *Phillips*, 524 U.S at 165, 168, 172; *Webb's*, 449 U.S. at 164; *Schneider v. Dept. of Corrections*, 151 F.3d at 1200; *Fowler*, 899 F.3d at 1118-20; *Fowler*, 2024 WL 4891016 at *2-3; *Taylor*, 402 F.3d at 935-36; and *Goldberg*, 912 F.3d at 1009-12. It is independently required by law of trusts requiring disgorgement of the trust's gains, by Washington statutes, and by the remedy of restitution to prevent unjust enrichment by requiring disgorgement of any gains. And DRS has determined the actual earnings to be re-credited—8.92% per year.

While *Schneider v. County of San Diego* is inapplicable to returning gains, there is no doubt that the Washington State Investment Board (WSIB), of which DRS Director Tracy Guerin is a board member, more than meets *Schneider*'s "prudent investor" standard. The WSIB is in charge of investing the retirement contributions placed in the Commingled Trust Fund and

the TRS Plan 3 Total Allocation Portfolio within it.  By statute, the WSIB "shall invest and manage the assets entrusted to it with reasonable care, skill, prudence, and diligence under circumstances then prevailing which a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an activity of like character and purpose."  RCW 43.33A.140.  And the Legislature specifically charged the WSIB with establishing policies "designed exclusively to maximize return at a prudent level of risk."  RCW 43.33A.110.  The WSIB thus explains that, in managing the Commingled Trust Fund, it "invest[s] the funds entrusted to us with integrity, care, and skill to maximize returns over the long term at a prudent level of risk for the exclusive benefit of beneficiaries," *i.e.*, the pension beneficiaries.  WSIB, *Vision, Mission, Values* (available at https://www.sib.wa.gov/docs/info/vmv.pdf) (last accessed February 21, 2025).

Thus, *Schneider v. County of San Diego* is not pertinent and does not require denying the teachers the actual returns their funds earned while involuntarily invested in the Commingled Trust Fund/TAP since 1996-98.

In addition to *Schneider*, DRS previously quibbled with some aspects of the application of the formula.  For example, it contended that Mr. Marshall was incorrect in using earnings before 1995 but reported in 1996 as part of the transfer balance.  Dkt. 138 at 5.  However, the teachers pointed out that is precisely what DRS itself had decided to do.  Dkt. 142, Ex. 1, Bates Nos. 100186-90.  Much of the Director's previous briefing focused on such quibbles, mostly related to small details because of missing data.  Such omissions or losses of data do not warrant denying the motion.[10]

---

[10] In addition for being responsible for the taking of interest, the Director is also responsible for any and all gaps in the teachers' account records.  Director Guerin testified that DRS has the responsibility to "keep accurate information in the records about the activities within each account."  Stobaugh [2/20/25] Dec., ¶15 and Ex. E.  See also RCW 41.34.130(3)(a)(i) (DRS "shall keep…full and adequate accounts and records"); *Restatement (Third) of Trusts* § 82 p. 204 (2007) ("trustee 'has' duty to maintain clear, complete, and accurate books and records").

MOTION TO DETERMINE FORMULA  -  20
3:15-cv-05367-BHS

1    The teachers have proposed a formula that is well supported by the law.  The teachers

2    anticipate that the Director will raise similar quibbles, likely based on deficiencies in her own

3    records.  But where, as here, the fact of damage has been established, the party responsible for

4    the loss (DRS) cannot object due to uncertainty as to the exact amount due to any individual.

5    *Bigelow v. RKO Pictures, Inc*., 327 U.S. 251, 265 (1946); *Adray v. Adray-Mart, Inc*., 76 F.3d

6    984, 989 (9th Cir. 1995); *Wenzler & Ward Plumbing v. Sellen*, 53 Wn.2d 96, 98-100 (1958).  If

7    there is some doubt, "the wrongdoer shall bear the risk of the uncertainty which his own wrong

8    has created."  *Moore*, 181 Wn.2d at 314, quoting *Bigelow*.  Thus "[o]nce the fact of loss

9    is…proven, courts will not quibble over the numbers involved, but will use a lenient approach to

10    the measurement of those damages."  *Kissell v. Gressley*, 591 F.2d 47, 50 (9th Cir. 1979);

11    *accord*, *Holabird v. Kagin*, 829 Fed.Appx. 194, 196 (9th Cir. 2020) (unpublished).

12    Moreover, "it is not unusual, and probably more likely…, that aggregate evidence of the

13    defendant's liability is more accurate and precise than would be so with individual proofs of

14    loss."  *Moore*, 181 Wn.2d at 308, quoting 3 *Newberg on Class Actions* § 10:2, at 479 (4th ed.

15    2002).  Using actual historical average earnings for the fund as a whole is thus most likely to be

16    the most accurate method for determining the earnings on the teachers' funds over a long period.

17    *Id.*  Indeed, DRS has precisely determined how much each class member's funds earned from

18    1992 through the end of 2024 in the Commingled Trust Fund—8.92% per year.

19    Because the teachers have presented a formula that is well supported by the law and uses

20    the best available data from DRS, the Court should adopt the formula despite the Director's

21    anticipated quibbles.

<u>**Conclusion**</u>

23    The Court should grant the teachers' motion.

24    I certify that this memorandum contains 7,683 words, in compliance with the Local Civil

25    Rules.

**STOBAUGH & STRONG, P.C.**
126 NW CANAL STREET, SUITE 100
SEATTLE, WASHINGTON  98107
(206) 622-3536

DATED this 21st day of February, 2025.

Respectfully submitted,

STOBAUGH & STRONG, P.C.

*/s/ David F. Stobaugh*
David F. Stobaugh, WSBA #6376
Stephen K. Strong, WSBA #6299
Alexander F. Strong, WSBA #49839
126 NW Canal Street, Suite 100
Seattle, Washington  98107
(206) 622-3536
davidfstobaugh@bs-s.com
skstrong@bs-s.com
astrong@bs-s.com
*Attorneys for Plaintiffs*

**MOTION TO DETERMINE FORMULA** - 22
3:15-cv-05367-BHS

**WASHINGTON STATE INVESTMENT BOARD**                    **DECEMBER 31, 2024**

# Total Allocation Portfolio (TAP)

## Investment Objective

The Total Allocation Portfolio (TAP) is a diversified portfolio that is intended for long-term investors. TAP assets are invested globally across five major asset classes and broadly among industries and countries to maximize returns at a prudent level of risk.

## Investment Strategy

TAP assets are invested in public equities, fixed income products, private equity funds, real estate, and tangible assets such as timber and infrastructure. Under the direction and oversight of the Washington State Investment Board (WSIB), TAP assets are primarily managed by external investment professionals and partners. The fixed income portfolio for the TAP is internally managed by WSIB staff.

### Public Equity

The TAP's public equity program is structured to reflect the globalization of capital markets. Investment managers for this program are selected by the WSIB for their insights and long-term convictions. They seek to achieve risk adjusted returns by finding the most attractive opportunities wherever they are in the world. All investments are in broad market-based domestic and non-U.S. passive index funds and global and emerging markets active mandates.

### Fixed Income

The fixed income program, directly invested by WSIB staff seeks a rate of return over the Barclays Capital Universal Index.

### Private Equity, Real Estate, & Tangible Assets

These programs provide additional diversification for the TAP and provide access to long-term illiquid investment opportunities that are not typically available to most individuals. Investment commitments in these asset classes are generally considered more risky than publicly traded investments, but when employed consistently as part of a larger balanced portfolio, they can offer higher returns than traditional public equity investments.

## Performance

|  | Fund(1) | Benchmark(2) |
|---|---|---|
| Quarter | -0.28% | -1.65% |
| 1 Year | 7.93% | 11.98% |
| 3 Year | 4.50% | 3.07% |
| 5 Year | 9.38% | 7.04% |
| 10 Year | 9.11% | 7.12% |
| Since Inception (7/1/92) | 8.92% | 7.55% |

### Historical Performance for Fiscal Years Ending June 30



### Composition



For more information on the TAP which is identical to the Commingled Trust Fund (CTF), visit our website: http://www.sib.wa.gov

(1) All performance figures are provided net of the manager's fees and other expenses, currently 0.5162%, debited from the fund. This is the same return and cost for all the State's retirement funds. Plan 3 members do not pay any additional fees to invest in the TAP. Historical performance is not necessarily indicative of future investment performance, which could differ substantially. All returns are calculated in U.S. dollars.
(2) The custom benchmark weights various published market indices in accordance with the target investment composition of the TAP investment pool. The index is currently derived from a weighting of 69% MSCI ACW IMI w/U.S. Gross and 31% Barclays Capital Universal as of January 2012. From 2008 to 2011 it was 69% Dow Jones Global TSMI and 31% Barclays Capital Universal. Prior to that, it was derived from 52% Dow Jones Wilshire 5000 (domestic stock index), 25% Lehman Universal (domestic fixed income index), and 23% MSCI ACWI ex US (international stock index). The benchmark has changed over time in both the percentage weightings and the target index.

Note: Totals may not add up due to rounding.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

**<u>Declaration of Service</u>**

I, Anders Forsgaard, declare that I effected service via e-mail of the following documents on the parties listed below through the CM/ECF system:

Document(s):
1. Motion to Determine Formula for Injunctive Relief
2. Declaration of David F. Stobaugh
3. Declaration of John D. Marshall
4. Notice of Filing

Parties:
Robert B. Mitchell, WSBA #10874
Philip M. Guess, WSBA #26765
Todd L. Nunn, WSBA #23267
K&L GATES LLP
925 Fourth Avenue, Suite 2900
Seattle WA 98104
206-623-7580
robert.mitchell@klgates.com
philip.guess@klgates.com
todd.nunn@klgates.com

Andrew Krawczyk, WSBA #42982
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 40123
Olympia, WA 98504-0123
360-586-3506
andrew.krawczyk@atg.wa.gov

I declare under penalty of perjury that the foregoing is true and correct.

DATED this 21st day of February, 2025.


 */s/ Anders Forsgaard*
Anders Forsgaard
aforsgaard@bs-s.com