The Honorable Benjamin H. Settle

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MICKEY FOWLER, LEISA MAURER, and a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>TRACY GUERIN, Director of the Washington State Department of Retirement Systems,<br><br>Defendant. | Case No. 3:15-cv-05367-BHS<br><br>**DECLARATION OF JOHN D. MARSHALL ABOUT THE FORMULA AND CALCULATION USING THE FORMULA**<br><br>NOTE ON MOTION CALENDAR:<br>March 21, 2025 |

JOHN D. MARSHALL testifies as follows:

1. I am John D. Marshall. I am an actuary, and I have been active in the pension and health care arenas for over 40 years. I am a principal of Windsor Strategy Partners, Inc (WSP), which assists clients in a wide range of health care and pension issues. The firm's clientele include brokerage firms, third party administrators, insurance companies, municipalities and public school boards. We assisted class counsel in the *Moore v. Health Care Authority* litigation. Our analysis was discussed by the Washington Supreme Court in its opinion. 181 Wn.2d 299, 306, 308-09, 313 (2014).

**Professional Qualifications**

2. The professional association for actuaries is the Society of Actuaries. The highest

DECLARATION OF JOHN D. MARSHALL - 1
3:15-cv-05367-BHS

STOBAUGH & STRONG, P.C.
126 NW CANAL STREET, SUITE 100
SEATTLE, WASHINGTON 98107
(206) 622-3536

1  qualification in the Society of Actuaries is a Fellow. There are only about 13,000 Fellows in the
2  U.S. To become a Fellow one needs to pass a series of rigorous, distinct actuary exams. There
3  were ten exams when I became a Fellow in 1983. Each exam requires about 500 hours of study
4  and it normally requires about five to ten years to complete all the exams and become a Fellow
5  of the Society of Actuaries. Before I became a Fellow, I was an Associate of the Society of
6  Actuaries.

7  3.  I have been an Enrolled Actuary under ERISA since 1983. I am a past member of
8  the Enrolled Actuary Exam Committee from 1988 to 1994, and as chairman for the last two of
9  those years. The Enrolled Actuary exams are jointly sponsored by the Society of Actuaries and
10 the IRS to maintain compliance with standards for ERISA qualified pension plans. The role of
11 the committee is to write the exam questions through a lengthy process involving the IRS and
12 Society of Actuaries and to provide input on the grading of the exams which are given
13 semiannually.

14 4.  I have been a member since 1983 of the American Academy of Actuaries, the
15 professional organization that sets the standards of practice for actuaries, including the
16 requirements for issuing an actuarial opinion.

### Experience

18 5.  I have over forty years of experience as an actuary in the pension and health care
19 arenas. During the 1970's I worked at TIAA/CREF which provides investments for 403(b)
20 annuities for employees of higher education institutions. During the 1980's I worked at TPF&C
21 in Cleveland providing defined benefit valuations and defined contribution valuations for a broad
22 range of clientele. I worked on projects including defined benefit plan terminations,
23 nonqualified supplemental and executive, and ERISA defined benefit and defined contribution
24 plan compliance issues. After Cleveland, I worked at Buck Consultants in Pittsburgh as a
25 principal and actuary for several Fortune 500 clients.

26 6.  In the 1990s I joined Deloitte and Touche in Chicago as the Chief Actuary for
27

**DECLARATION OF JOHN D. MARSHALL** - 2
3:15-cv-05367-BHS

STOBAUGH & STRONG, P.C.
126 NW CANAL STREET, SUITE 100
SEATTLE, WASHINGTON 98107
(206) 622-3536

pensions in the Chicago office. While there I oversaw pension and defined contribution valuations, analyses, implementations and terminations. I personally developed a hybrid pension plan for higher education institutions. It involved converting an overfunded traditional defined benefit plan into a cash balance plan and using the excess funds to provide matching cash balance credits as an incentive for members to contribute to their own 403(b) account. This hybrid plan, dubbed by Deloitte & Touche "The Marshall Plan," was implemented for a Chicago teaching hospital.

7. Later in the 1990's I joined Actuarial Services Associates, a pension consulting firm in Somerset, NJ. While there I was the lead actuary for the New Jersey Education Association. The NJEA has 300,000 members. During this time we provided extensive analyses supporting the teachers union against an ill-conceived proposed bond to be issued by the State to fund the teachers' pension plan in lieu of State contributions from tax revenue.

8. In the 2000's I became chief actuary and chief underwriter for a prescription benefit management company, BeneCard Services, in Lawrenceville, NJ. In 2010 I joined Windsor Strategy Partners (WSP) and rejoined the consulting arena. Our primary clientele are health care clients. I serve as a health care actuary and the resident pension expert for pension-related activities.

9. Since 2009 I have been a Principal at WSP in Princeton, NJ where my work includes client medical and prescription network analysis and cost/budget projections and compliance issues; captive insurance company feasibility studies, actuary for various school districts in NJ, lead actuary for Meadowlands MEWA, and lead actuary for Benefit Advisors Network, a group of 120 brokerage firms throughout the U.S.

**Purpose of Declaration**

10. Class counsel retained Windsor Strategy Partners to assist in this litigation in state and federal court. I am submitting this declaration to explain the formula and how it is applied to calculate the amount owed to the class members for the denial of daily interest so that the Court

**DECLARATION OF JOHN D. MARSHALL** - 3
3:15-cv-05367-BHS

STOBAUGH & STRONG, P.C.
126 NW CANAL STREET, SUITE 100
SEATTLE, WASHINGTON 98107
(206) 622-3536

1 can order the Director to transfer those funds to the class members' accounts. We have
2 expended considerable effort to ensure that the calculation is as accurate as possible. The
3 calculation was done by me and Windsor employee Craig Neumon under my direction. The data
4 for the calculation were provided by the Department of Retirement Systems (DRS). I charge
5 $450 an hour for my work and Mr. Neumon's work is charged at $300 an hour.

6   11.   I previously submitted a preliminary calculation in federal court in which my
7 purpose was different—to show the fact of loss for the loss of daily interest, an issue at that time.
8 I noted "I am not trying to determine the precise amount of loss, just that tthere is in fact a loss
9 for the representative plaintiffs and the class." Dkt. 91, Marshall [2/4/21] Dec., ¶2. I explained
10 that I was only presenting the formula the teachers proposed and the fact of loss, not precise
11 amounts that should be transferred. DRS has subsequently clarified some data and provided
12 additional information that was not available to me when my previous declarations were
13 prepared.

### Problem Resolved by the Formula and Calculation

15   12.   Teachers' Retirement System (TRS) Plan 2 is a defined benefit retirement plan for
16 teachers. TRS Plan 3 is a hybrid retirement plan under which the teachers have one-half of the
17 defined benefit of TRS Plan 2 and a separate defined contribution plan. The teacher class
18 members here transferred from TRS Plan 2 to TRS Plan 3. For these teachers, the defined
19 contribution portion of TRS Plan 3 was funded by the employee contributions plus accrued
20 interest at the rate set by the Director in 1977, 5.5% annual interest compounded quarterly. In
21 addition, under RCW 41.32.8401 these transferring teachers received a transfer incentive
22 payment based on the amount of their employee contributions plus accrued interest up through
23 1995 when they transferred to TRS Plan 3.

24   13.   The problem here is that DRS did not calculate interest properly because it did not
25 credit daily interest, but instead used a quarter-ending balance method. This method is described
26 in the Ninth Circuit's opinion, *Fowler v. Guerin*, 899 F.3d 1112, 1115 (9th Cir. 2018). DRS's
27

**DECLARATION OF JOHN D. MARSHALL - 4**
3:15-cv-05367-BHS

STOBAUGH & STRONG, P.C.
126 NW CANAL STREET, SUITE 100
SEATTLE, WASHINGTON 98107
(206) 622-3536

error in not crediting daily interest reduced the amount in the teachers' accounts (the teachers' contributions plus accrued interest on those contributions) and it reduced the amount of the transfer incentive payment.

### Three Components of Formula

14. There are three components in the formula to correct DRS's errors. These are the legal assumptions necessary to calculate amounts owed for accrued but uncredited daily interest. The first component is daily interest. DRS's daily interest error occurs with each teacher contribution because DRS did not credit interest to contributions in the quarters in which the contributions are made. Thus, for each teacher, DRS's withholding of interest begins when the teacher first makes each contribution, *i.e.*, the date the contributions are taken out of their paycheck. Every quarter-ending balance is wrong because it includes only the deposits, not the daily interest earned on those deposits during the quarter, and this omission continues for each quarter of work. The quarterly compounding (earning interest on previously accrued interest) is accordingly also wrong for each quarter. Moreover, as noted by the Ninth Circuit, 899 F.3d at 1115, DRS did not credit the class members' accounts with interest on the entire account balance (the previous quarter-ending balance plus contributions made during the quarter of transfer) during the quarter of transfer to TRS Plan 3. Thus, the interest earned each quarter and quarterly compounding for each quarter of the teachers' work is calculated to the date of transfer to correct each class members' final account balance.

15. The second element of the formula involves the incentive payment due under RCW 41.32.8401 for teachers who requested transfer from TRS Plan 2 to TRS Plan 3 before January 1, 1998. Under RCW 41.32.8401, the transferring teachers were to receive an incentive payment in their TRS Plan 3 accounts based on their account balance (accumulated contributions plus interest) on December 31, 1995, called "Transfer Basis Amount" in the data for each class member provided by DRS described in DRS's excel spreadsheet. The final account balance for the transfer payment includes contributions made either before or after December 31, 1995 for

DECLARATION OF JOHN D. MARSHALL - 5
3:15-cv-05367-BHS

STOBAUGH & STRONG, P.C.
126 NW CANAL STREET, SUITE 100
SEATTLE, WASHINGTON 98107
(206) 622-3536

1   work performed up to December 31, 1995. DRS July 19, 1995 Decision Statement, attached as
2   Exhibit 1 to Dkt. 142, A. Strong Dec. DRS provided the data needed to account for this in the
3   earnings history data that it supplied. Most of the class members received a payment of 65% of
4   that balance, a few were eligible to receive only 40%, and a small number were not eligible for
5   any additional payment. See RCW 41.32.8401 (transfer incentive payment percentage based on
6   date of transfer). The data provided by DRS show which teachers were eligible to receive 65%,
7   40%, or zero, depending on each teacher's status and transfer date and when the payments were
8   made. Because DRS did not credit the right amount of interest when it determined the final
9   account balance as of December 31, 1995, called the Transfer Basis Amount by DRS, there must
10  be an addition to the Transfer Basis Amount for each class member who had some daily interest
11  omitted in that account balance.

12      16.     Thus, to correct DRS's error, we calculated for each class member the missing
13  daily interest up to December 31, 1995 to determine the correct account balance on that date.
14  We then subtracted DRS's Final Account Balance on December 31, 1995 from the Corrected
15  Final Account Balance on that date after the missing interest is added. The difference is then
16  multiplied by the appropriate transfer payment percentage, 65% or 40% or 0%, providing the
17  amount to be added onto the accumulated contributions under RCW 41.32.8401

18      17.     The final element in the formula covers the period from the date of transfer to
19  TRS Plan 3 to the date when the funds are returned to the teachers' accounts. During this time
20  the teachers' funds were retained in the Commingled Trust Fund where they earned investment
21  returns. *Fowler*, 899 F.3d at 1115 ("Plan 2 contributions are invested in a commingled trust fund
22  by the Washington State Investment Board").

23      18.     The Washington State Investment Board is in charge of investing the
24  contributions and placed in the Commingled Trust Fund. By statute, the WSIB "shall invest and
25  manage the assets entrusted to it with reasonable care, skill, prudence, and diligence under
26  circumstances then prevailing which a prudent person acting in a like capacity and familiar with

**DECLARATION OF JOHN D. MARSHALL** - 6
3:15-cv-05367-BHS

STOBAUGH & STRONG, P.C.
126 NW CANAL STREET, SUITE 100
SEATTLE, WASHINGTON 98107
(206) 622-3536

1  such matters would use in the conduct of an activity of like character and purpose." RCW
2  43.33A.140. Thus, the Legislature specifically charged the WSIB with establishing policies
3  "designed exclusively to maximize return at a prudent level of risk." RCW 43.33A.110. WSIB
4  explains that, in managing the Commingled Trust Fund, it "invest[s] the funds entrusted to us
5  with integrity, care, and skill to maximize return over the long term at a prudent level of risk for
6  the exclusive benefit of beneficiaries," *i.e.*, the pension beneficiaries. WSIB, *Vision, Mission*
7  *Values* (available at https://www.sib.wa.gov/docs/info/vmv.pdf) (last accessed February 5,
8  2025). The WSIB must "[c]onsider investments not in isolation, but in the context of the
9  investment of the particular fund as a whole and as part of an overall investment strategy" and
10 "[d]iversify the investments of the particular fund unless, because of special circumstances, the
11 board reasonably determines that the purposes of that fund are better served without
12 diversifying." *Id*. The prudent investor rule requires the fund manager to consider whether "the
13 particular investment or investment course of action is reasonably designed…to further the
14 purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or
15 other return) associated with the investment …compared to the opportunity for gain (or other
16 return) associated with reasonably available alternatives with similar risks; and…, [t]he
17 composition of the portfolio with regard to diversification, [t]he liquidity and current return of
18 the portfolio relative to the anticipated cash flow requirements of the plan; and [t]he projected
19 return of the portfolio relative to the funding objectives of the plan." 29 CFR §2550.404a-1(b).[1]

20         19.     Here, the Commingled Trust Fund has substantial distribution requirements
21 because it is used to pay retiree pension benefits. Simultaneously, the Commingled Trust Fund
22 must also obtain significant investment returns because investment returns fund the majority of
23 the pensions owed to TRS plan members. According to Washington State Actuary Matthew

---

[1] While TRS plans are governmental plans not subject to ERISA, Washington has also adopted the prudent investor rule. RCW 11.100.200; RCW 43.33A.140. The ERISA regulation explains the American version of the prudent investor rule in greater detail.

DECLARATION OF JOHN D. MARSHALL - 7
3:15-cv-05367-BHS

STOBAUGH & STRONG, P.C.
126 NW CANAL STREET, SUITE 100
SEATTLE, WASHINGTON 98107
(206) 622-3536

1  Smith, "investment returns historically…have covered about 70 percent of the cost of pension
2  benefits." Smith Dep., p. 20; Stobaugh [2/20/25] Dec., Ex. E. Under the prudent investor rule,
3  the WSIB must have a diversified portfolio that takes these necessities into account.

4      20.    As of December 31, 2024 DRS has determined the actual investment returns for
5  trends in Washington State Investment Board's Commingled Trust Fund (CTF). DRS offers
6  TRS Plan 3 participants an investment option called TAP (Total Allocation Portfolio), which is
7  invested in the CTF. See attached report from DRS's website. DRS's determination that the
8  TAP returns have equaled 8.92% for each year after deducting all fees for management. We can
9  calculate the investment returns earned on the teachers' funds that were held in the Commingled
10  Trust Fund. *Fowler*, 2024 WL 4891016 at *2.

### Data Provided by the Director and How It Is Used in the Formula

12      21.    DRS provided the data that we used to do these calculations. The data provided is
13  voluminous, but well within our experience at Windsor. Windsor has many clients with large
14  databases that we have to access and use for actuarial calculations. Craig Neumon, who works
15  under my direction, is Windsor's main person in handling these large databases.

16      22.    We have made the most accurate possible calculation with the data provided. I
17  will briefly explain the data.

18      23.    DRS provided some a "transaction file" that contained information extracted from
19  a DRS information system. DRS described the data extracted as follows:

**Excel Spreadsheet Explaining Transaction Files**

| Column Heading | Definition |
| --- | --- |
| Last Name | Member's last name on file |
| First Name | Member's first name on file |
| Middle Name | Member's middle name or initial on file |
| Plan Transfer Date | This is the date the member's salary, contributions and hours, and the account balance were transferred from TRS Plan 2 to TRS Plan 3 |
| Trade Date | This is the date the money began earning an investment return in the Plan 3 account |
| Account Balance | This is the total of the member's accumulated contributions (contributions plus regular interest) transferred on the "Plan Transfer Date" to the member's TRS Plan 3 account. |

DECLARATION OF JOHN D. MARSHALL - 8
3:15-cv-05367-BHS

STOBAUGH & STRONG, P.C.
126 NW CANAL STREET, SUITE 100
SEATTLE, WASHINGTON 98107
(206) 622-3536

| | |
|---|---|
| Plan 2 Interest Amount | This is the portion of the "Account Balance" attributable to the regular interest credited in the TRS Plan 2 account. |
| Transfer Basis Amount | This is the TRS Plan 2 account balance as of 12/31/1995 and is used in calculating the transfer payment amounts |
| Transfer Payment Date #1 | This is the date DRS calculated the member's 40% transfer payment |
| Transfer Payment Trade Date #1 | This is the date the 40% transfer payment began earning an investment return in the Plan 3 account |
| Transfer Payment Amount #1 | This is the 40% transfer payment amount the member received |
| Transfer Payment Date #2 | This is the date DRS calculated the member's 25% transfer payment |
| Transfer Payment Trade Date #2 | This is the date the 25% transfer payment began earning an investment return in the Plan 3 account |
| Transfer Payment Amount #2 | This is the 25% transfer payment amount the member received |
| Member Death Date | If applicable, this is the date the member died |
| Member ID # | This is a "dumb ID" number generated by the system. |

**Transaction File**

| | |
|---|---|
| Member ID # | This is a "dumb ID" number generated by the system. This number is needed in order to match the individual member contribution amounts and transaction dates |
| Transaction Date | This is the date DRS received the member's TRS Plan 2 contribution from the employer |
| Contribution Amount | This is the contribution amount DRS received from the employer for a specific member on a specific transaction date |

Although DRS said it provided class member names, the file it provided did not include names (except for some with anomalous data). Thus, class members are identified by their member ID number in the retirement system.

24. DRS at first did not provide this transaction data for a group of class members it referred to as "inactive." DRS excluded "inactive" members because it considered them not to be members of the class. Later, it agreed they are members of the class and forwarded transaction data for these class members.

25. DRS also did not initially include transaction data for class members with what it called anomalous data (and therefore, they were not included in my earlier estimate of loss). DRS later corrected the data with anomalies and provided the required information for these

DECLARATION OF JOHN D. MARSHALL - 9
3:15-cv-05367-BHS

STOBAUGH & STRONG, P.C.
126 NW CANAL STREET, SUITE 100
SEATTLE, WASHINGTON 98107
(206) 622-3536

1  class members.  We have received DRS's notes regarding these class members, accepted the

2  corrections made by DRS, and included class members with anomalous data in the calculation.

3      26.    DRS provided "earnings period information," *i.e.*, stating what earnings period

4  the contributions pertained to.

5      27.    The transaction data contained some adjustments to class member accounts that

6  we understood as changes to contribution amounts and contribution periods, *e.g.*, DRS subtracted

7  $100 in the third quarter of 1993 for earnings previously credited in the first quarter of the year

8  before, 1992.  Whenever DRS made such corrections, we matched those corrections to the

9  earnings period so that the money erroneously credited during the period did not earn interest.

10  However, not all such corrections were tied to an earnings period.  In these instances, we

11  subtracted the contribution at the time the correction was reported.

12      28.    When DRS initially transmitted the transaction data, it said that the data included

13  "Transaction Dates," which it said "is the date DRS received the member's plan 2 contribution."

14  However, for about one-third of the contributions, DRS's data did not show when the

15  contributions were received during the month.  The Transaction Date is shown as "00" in the

16  transaction file in these cases.

17      29.    Later, in response to my declarations that said we relied on the Transaction Date

18  as the date when interest because to accrue and made an estimate of the Transaction Date for the

19  files lacking that date, DRS clarified that the "Transaction Date" is *not* the date when the money

20  was received.  It said the contributions are "entirely separate" from the dates that the

21  contributions were made.  This is explained in the accompanying Declaration of David F.

22  Stobaugh describing testimony of Sarah Blocki.

23      30.    Thus, the best information available about when the deposits were made is the

24  earnings period information because that would have been when employee contributions were

25  deducted from the employee paychecks.  The formula and the calculation uses the end of the

26  earnings period as the date when daily interest begins to accrue.

27

**DECLARATION OF JOHN D. MARSHALL** - 10
3:15-cv-05367-BHS

**STOBAUGH & STRONG, P.C.**
126 NW CANAL STREET, SUITE 100
SEATTLE, WASHINGTON 98107
(206) 622-3536

     31.     Using the end of the earnings period as the date interest begins to accrue resolves the problem that DRS has no Transaction Date for about one-third of the entries. It is also consistent with DRS's decision on transfer payments regarding including contributions that had a transaction date after December 31, 1995 but an earnings period ending no later than December 31, 1995 in calculating each member's accumulated contributions that serve as the basis for the transfer payment. On July 19, 1995, DRS issued a decision on Transfer Balances in which it decided that "Plan II accumulated contributions as of January 1, 1996" would "[i]nclude all transactions for December 1995 or prior **EARNING PERIODS** in the January 1, 1996 account balance." (Attached as Exhibit 1 to Dkt. 142, Bates Nos. 100189-90.) DRS determined that under this approach "Members receive the most accurate January 1, 1996 account balance, based on earning period." *Id.*, p. 5. In a later decision, DRS further explained its earlier decision. Dkt. 142, Ex. 1, Bates Nos. 100217. DRS explained that it had "determined that member contributions, which were deducted from member compensation in December, but not credited until January 1996" and "contributions which should have been included in a member's account prior to January 1, 1996, but which were posted after that date due to employer or DRS error, should be included in the January 1, 1996 accumulated contributions." *Id*. Thus, DRS has previously established that "accumulated contributions" include contributions based on "earning period," rather than transaction date.

     32.     There are 26,785 TRS Plan 3 members in the data.[2]

### Application of the Formula

     33.     Based on the data supplied by DRS, as explained above, we calculated the specific amounts for each class member that should be transferred from TRS Plan 2 funds to each class member's TRS Plan 3 account. It has been calculated to a reasonable professional

---

[2] DRS provided data for some individuals that transferred zero dollars from Plan 2 to Plan 3. Since they transferred zero dollars, those individuals experienced no loss and are not included in the formula and calculation.

DECLARATION OF JOHN D. MARSHALL - 11
3:15-cv-05367-BHS

STOBAUGH & STRONG, P.C.
126 NW CANAL STREET, SUITE 100
SEATTLE, WASHINGTON 98107
(206) 622-3536

1  certainty based on information provided by DRS.

2      34.    The calculation is a summary of voluminous records under Evidence Rule 1006 for over 26,000 class members. The calculation could be done by hand, person-by-person, pay-period-by-pay-period, but that calculation would not be feasible. And so we use a computer to do the same calculation as would be done by hand, person-by-person. My understanding is that because my testimony just explains a calculation no separate expert report is needed. If a document denominated as an expert report is needed, this declaration and my previous declarations submitted in this court and state court, and the interrogatory answers that I assisted with in state court, collectively constitute my expert report.

    35.    Initially, daily interest is calculated. The interest rate up to the date of transfer for TRS Plan 2 to TRS Plan 3 is 5.5% annual interest compounded quarterly, *i.e.*, 5.5% divided by 365 equals 0.01507% per day. Daily interest is earned on each contribution amount starting from the end of the earnings period for the contribution to the end of the quarter. The daily interest is then added to the principal balance for the purpose of calculating compound interest (interest on interest). This is calculated for each class member for each pay period until the day of transfer shown in DRS's data. That number is the final account balance for each class member. The computer then subtracts the DRS final account balance at the time of transfer from the final account balance with daily interest. The difference is the daily interest that was omitted.

    36.    Next, the amount of the missing transfer payment is calculated by multiplying the missing interest by the transfer incentive payment percentage shown in DRS's records, *i.e.*, 65%, 40%, or no incentive payment.

    37.    The missing interest on the transfer date and the missing transfer incentive payment on their payment dates shown in DRS data are added together to determine the amount of money that is owed to each class member. This is the amount of money that DRS retained in the Commingled Trust Fund.

    38.    The investment returns for each class member's funds that DRS retained in the

DECLARATION OF JOHN D. MARSHALL - 12
3:15-cv-05367-BHS

STOBAUGH & STRONG, P.C.
126 NW CANAL STREET, SUITE 100
SEATTLE, WASHINGTON 98107
(206) 622-3536

1  Commingled Trust Fund are then calculated at the rate of 8.92% per annum, the average rate of
2  return determined by DRS, and are then added for the time that this money was kept in the
3  Commingled Trust Fund .

4      39.    The attached spreadsheet lists the amounts for each class member, the amount of
5  the omitted interest, the amount of the omitted transfer payment based on the omitted interest,
6  the amount of the investment gains, and the sum of these, which is the amount to be transferred
7  from TRS Plan 2 to each class member's TRS Plan 3 account.

8      40.    The amounts for Mickey Fowler are $535.63 in lost daily interest, $263.55 in lost
9  transfer incentive payment, and $8,129.81 in investment gains, which results in a sum of
10 $8,928.99 to be transferred from TRS Plan 2 to Mr. Fowler's TRS Plan 3 account. The amounts
11 for Leisa Maurer are $693.53 daily interest, $354.16 transfer incentive payment, and $10,645.79
12 investment gains, which results in a sum of $11,693.49 to be transferred from TRS Plan 2 to Ms.
13 Maurer's TRS Plan 3 account.

14     41.    The amounts for the class as a whole are $10,078,049 daily interest, $3,127,947
15 transfer incentive payment, and $124,410,373 investment gains, which results in a sum of
16 $137,616,369 to be transferred from TRS Plan 2 to the class members' TRS Plan 3 accounts.

17     42.    We have calculated these amounts up to June 30, 2025. If the transfer occurs on
18 July 1, 2025 or thereafter, the amounts would increase by 8.92% annual interest, approximately
19 0.0244% per day.

20     I declare under penalty of perjury that the foregoing is true and correct.
21     Executed this _20_ day of February, 2025 at Princeton, New Jersey.

_____
John D. Marshall

DECLARATION OF JOHN D. MARSHALL - 13
3:15-cv-05367-BHS

STOBAUGH & STRONG, P.C.
126 NW CANAL STREET, SUITE 100
SEATTLE, WASHINGTON 98107
(206) 622-3536

**WASHINGTON STATE INVESTMENT BOARD**  **DECEMBER 31, 2024**

# Total Allocation Portfolio (TAP)

### Investment Objective
The Total Allocation Portfolio (TAP) is a diversified portfolio that is intended for long-term investors. TAP assets are invested globally across five major asset classes and broadly among industries and countries to maximize returns at a prudent level of risk.

### Investment Strategy
TAP assets are invested in public equities, fixed income products, private equity funds, real estate, and tangible assets such as timber and infrastructure. Under the direction and oversight of the Washington State Investment Board (WSIB), TAP assets are primarily managed by external investment professionals and partners. The fixed income portfolio for the TAP is internally managed by WSIB staff.

### Public Equity
The TAP's public equity program is structured to reflect the globalization of capital markets. Investment managers for this program are selected by the WSIB for their insights and long-term convictions. They seek to achieve risk adjusted returns by finding the most attractive opportunities wherever they are in the world. All investments are in broad market-based domestic and non-U.S. passive index funds and global and emerging markets active mandates.

### Fixed Income
The fixed income program, directly invested by WSIB staff seeks a rate of return over the Barclays Capital Universal Index.

### Private Equity, Real Estate, & Tangible Assets
These programs provide additional diversification for the TAP and provide access to long-term illiquid investment opportunities that are not typically available to most individuals. Investment commitments in these asset classes are generally considered more risky than publicly traded investments, but when employed consistently as part of a larger balanced portfolio, they can offer higher returns than traditional public equity investments.

### Performance

|  | Fund[1] | Benchmark[2] |
|---|---|---|
| Quarter | -0.28% | -1.65% |
| 1 Year | 7.93% | 11.98% |
| 3 Year | 4.50% | 3.07% |
| 5 Year | 9.38% | 7.04% |
| 10 Year | 9.11% | 7.12% |
| Since Inception (7/1/92) | 8.92% | 7.55% |

### Historical Performance for Fiscal Years Ending June 30



2015: 4.93%, 2016: 2.65%, 2017: 13.44%, 2018: 10.20%, 2019: 8.36%, 2020: 3.71%, 2021: 28.68%, 2022: 5.39%, 2023: 5.24%, 2024: 8.50%, 2025 FYTD: 3.44

### Composition



- INNOVATION 1.22%
- CASH 0.07%
- FIXED INCOME 17.01%
- TANGIBLE ASSETS 7.15%
- REAL ESTATE 18.92%
- PUBLIC EQUITY 26.74%
- PRIVATE EQUITY 28.89%

---

For more information on the TAP which is identical to the Commingled Trust Fund (CTF), visit our website: http://www.sib.wa.gov

(1) All performance figures are provided net of the manager's fees and other expenses, currently 0.5162%, debited from the fund. This is the same return and cost for all the State's retirement funds. Plan 3 members do not pay any additional fees to invest in the TAP. Historical performance is not necessarily indicative of future investment performance, which could differ substantially. All returns are calculated in U.S. dollars.
(2) The custom benchmark weights various published market indices in accordance with the target investment composition of the TAP investment pool. The index is currently derived from a weighting of 69% MSCI ACW IMI w/U.S. Gross and 31% Barclays Capital Universal as of January 2012. From 2008 to 2011 it was 69% Dow Jones Global TSMI and 31% Barclays Capital Universal. Prior to that, it was derived from 52% Dow Jones Wilshire 5000 (domestic stock index), 25% Lehman Universal (domestic fixed income index), and 23% MSCI ACWI ex US (international stock index). The benchmark has changed over time in both the percentage weightings and the target index.

Note: Totals may not add up due to rounding.